IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**UNITED STATES OF AMERICA,**      CASE NO. 3:22 CR 274

    Plaintiff,

    v.      JUDGE JAMES R. KNEPP II

**ANTHONY THEODOROU,**

    Defendant.      **MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

In this criminal case, the Government filed a motion to compel production of documents underlying Defendant Anthony Theodorou's expert reports (or, in the alternative, to exclude those experts' testimony as it relates to a motion to suppress). (Doc. 53). Defendant responded. (Doc. 56). The Government replied and narrowed its request for production. (Doc. 59). For the following reasons, the Court grants the Government's motion in part as set forth herein.

### BACKGROUND

The background of this case as relevant to this Order is as follows:

On May 2, Defendant Anthony Theodorou was charged in a complaint with distribution of a controlled substance, drug conspiracy, importation of a controlled substance, and accessory after the fact in connection with a homicide. *See* Doc. 1. The Auglaize County Sheriff's Department and the Federal Bureau of Investigation ("FBI") had previously interviewed Defendant about the matter. *Id.* at 9-12. The FBI agent who interviewed Defendant stated Defendant was advised of his

*Miranda* rights before being questioned. *Id.* at 9. On May 25, 2022, a federal grand jury returned an indictment against Defendant (as well as two other defendants). *See* Doc. 11.

On July 13, 2023, Defendant filed a motion to suppress all statements he made to law enforcement officers during his questioning. *See* Doc. 48. Expert reports from Brian Leslie, Dr. Bruce Frumkin, and Matthew Jones were attached in support of the motion. *See* Doc. 48-1, Doc. 48-2, Doc. 48-3, Doc. 48-4, Doc. 48-5. According to Theodorou's counsel, these expert reports "cast[] doubt on the validity of [Defendant's *Miranda* waiver]" and detailed Defendant's "unique susceptibility to coercive interrogation tactics." (Doc. 48, at 4).

Primarily at issue is Dr. Frumkin's report. It reads, in relevant part:

> [D]espite how he presented behaviorally, Mr. Theodorou[,] when questioned, endorsed symptoms indicative of marginal reality testing. He appears to experience auditory hallucinations in which he hears voices coming from outside his head. He said that prior to his proposal to [his ex-wife], a voice told him "Don't do it." Prior to this, at age 12 while home alone, he heard running footsteps in the house and outside at the security gate. He was frightened enough to call his father and to walk downstairs with a baseball bat. He said he saw a "white feather" in the hallway but saw no one in the home. The house was "locked solid." He said that at age 23, in Bulgaria for a football match, while resting on his bed, almost asleep, he felt a pressure on his chest and could not move. He then heard Greek chanting, first a whisper, than [sic] increasing in volume to a loud noise. When the voice stopped, he could move again. He described having these hallucinatory experiences once every year or two. The most recent time was a year or two ago when he was getting his clothes out of the cupboard, he heard a woman's voice say "Hello." No one was in the room.
>
> When asked about having any 'special power,' he said when he speaks people are more prone to listen to him than others because his accent "calms them down." He says he helps people in jail because of this. He said he believes this is a special ability only he can do. He also said that he smells a perfume or a sweet smell when he reads the Bible. He said that this happens some three to four times weekly. He said it first began when he was 13 or 14 years of age.
> …
> Results from the MMPI-3 show no evidence he was minimizing or exaggerating psychological symptoms. . . . Results of the MMPI-3, combined with my behavioral observations and his past history, suggests that Mr. Theodorou's severity of symptoms . . . is [] consistent with a Schizotypal Personality Disorder. . . . He also demonstrates some features of a Dependent Personality Disorder . . . he does not

2

meet the full DSM-5-TR criteria to have a formal diagnosis on either of these two disorders.

On the GSS 1, a test designed to measure interrogative suggestibility, Mr. Theodorou was at the upper 95% range in terms of his interrogative suggestibility. He is much more apt to give in to misleading information with and without pressure (90th and 94th % range, respectively) and to shift his response, right or wrong, to a different response when told he gave the wrong answers (upper 90% range).

The CMR and CMR-R were administered to help assess Mr. Theodorou's current ability to make a knowing waiver of his rights. The CMR required Mr. Theodorou to be able to paraphrase in his own words what each of the four Miranda warnings presented meant. . . . Mr. Theodorou obtained a perfect score on the test. The CMR-R required Mr. Theodorou to state 'same' or 'different' whether comparison statements were similar in meaning to each of the four Miranda warnings. He got a perfect score on that test.

The FRI helps assess one's current ability to make an intelligent waiver of rights. . . . Mr. Theodorou did quite well on the test with one exception. He erroneously believes that one has to say what they did wrong in court.

Mr. Theodorou has the intellectual capacity to be able to make a knowing and intelligent waiver, with the exception of his belief that one has to say what they did that was wrong in court. That is relevant because even if he knew he did not have to speak to the police (knowing waiver of right to silence), he could not make an intelligent use of that right because he erroneously believed one has to incriminate himself in court anyway.

The real issue is what Mr. Theodorou understood or appreciated about his rights during the administration of them by law enforcement. He was read his rights quickly by law enforcement. Despite his calm demeanor on the videotape, he was likely much more anxious when with law enforcement than with me. This would have impacted his understanding.

Second, although South Africa law has the equivalent of Miranda warnings for those being questioned by the South African Police Service, in practice many interrogations involve police brutality, including torture and assault. . . . In South Africa, it is not unusual that charges or arrests can go away if one bribes officers. . . . Throughout the interrogation, Mr. Theodorou asks law enforcement what can be done for him to facilitate him being able to fly home the following week.

(Doc. 48-3, at 4-7). Dr. Frumkin stated he relied upon the following for his report:

a) audio and audio video of Mr. Theodorou's interactions with law enforcement, b) videos displaying activity outside of the Super 8 Motel and Shell service station, c) Dash Cam video from the victim's car, d) a radiology report from Capitol

3

Radiology dated November 16, 2019, pertaining to Mr. Theodorou's injury from a motor vehicle accident, e) signed Miranda waiver form, f) various records from the Federal Bureau of Investigation (FBI) and the Auglaize County Sheriff's Office, and g) clinical records from Dr. Bodemer.

*Id.* at 2. Theodorou also attached to the motion to suppress Dr. Frumkin's *curriculum vitae*, which includes details of his education, experience, publications, and presentations. (Doc. 48-4).

The Government's motion to compel initially sought "all documents, items, and recordings created and reviewed as part of Frumkin's and Leslie's reports and conclusions." (Doc. 53, at 10). Upon reply, the Government narrowed this request to:

> (1) [the] radiology report from Capitol Radiology dated November 16, 2019, . . . (2) clinical records from Dr. Bodemer [prior treatment records to which Frumkin referred] . . . (3) . . . a list of all items in Frumkin's file to either the Court and/or the government . . . (4) . . . an *in camera* review in order to identify those items in Frumkin's file that are relevant to the legal and factual issues raised in the Motion to Suppress, and (5) . . . those items that the Court determines are relevant.

(Doc. 59, at 7). The Government contends this information is necessary to respond to Theodorou's motion to suppress.

## DISCUSSION

Under Federal Rule of Criminal Procedure 12.2, a defendant who "intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on . . . the issue of guilt" must notify the Government and the Court. Fed. R. Crim. P. 12.2(b). If the defendant gives such notice, the defendant must also, at the request of the Government, disclose for each expert witness:

- a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief;
- the bases and reasons for them;
- the witness's qualifications, including a list of all publications authored in the previous 10 years;
- and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

4

Fed. R. Crim. P. 16(b)(1)(C)(i); 16(b)(1)(C)(iii).

The Government states it is not making a *Daubert* challenge to Theodorou's experts at this juncture. (Doc. 53, at 11). And Theodorou has not made a notification under Rule 12.2 that he intends to introduce this expert evidence at trial; it was included only as part of his motion to suppress his statements to law enforcement officers. But the Government argues that Theodorou "has placed his mental health squarely at issue" by relying on the expert reports to support the motion to suppress. (Doc. 53, at 12). Theodorou responds that he has not raised competency as an issue. (Doc. 56, at 13).

The Federal Rules of Evidence do not apply to the admission of evidence presented at suppression hearings. *United States v. Stepp*, 680 F.3d 651, 668 (6th Cir. 2012). As Theodorou correctly states in his opposition brief (Doc. 56, at 6), the Government has pointed to no law which would entitle it to the information it seeks at this stage.

The Court finds, however, that the Government raises reasonable concerns regarding Theodorou's statements and expert reports. The Court therefore orders Theodorou to provide to the Government (1) the radiology report from a radiology report from Capitol Radiology dated November 16, 2019, pertaining to Theodorou's injury from a motor vehicle accident; (2) the clinical records from Dr. Bodemer pertaining to Theodorou; and (3) a list itemizing the entire contents of Dr. Frumkin's file. For any item(s) contained in Dr. Frumkin's file Theodorou does not produce, he must provide a privilege log containing sufficient detail for the Government to determine that item's relevance and potential discoverability. These items must be provided to the Government by November 20, 2023.

If the Government wishes to challenge the discoverability of any material withheld, it may request *in camera* review by this Court by November 30, 2023. A briefing schedule or hearing

date for Theodorou's underlying motion to suppress (Doc. 48) will be established once this discovery issue has been resolved.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that the Government's Motion to Compel (Doc. 53) be, and the same hereby is, GRANTED IN PART.

     s/ *James R. Knepp II*
     UNITED STATES DISTRICT JUDGE